IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:08-CV-152-D

| | |
|---|---|
| BARBARA J. RAGLAND, )<br>)<br>Plaintiff/Claimant, )<br>)<br>)<br>)<br>MICHAEL J. ASTRUE, )<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | **MEMORANDUM &**<br>**RECOMMENDATION** |

This matter is before the court on the parties' cross motions for judgment on the pleadings. Claimant Barbara Ragland seeks judicial review of the Commissioner's denial of her application for Disability Insurance Benefits (DBI) and Supplemental Security Income (SSI). After a thorough review of the record and consideration of the briefs submitted by counsel, the court recommends granting Claimant's Motion for Judgment on the Pleadings [DE-14], and recommends denying Defendant's Motion for Judgment on the Pleadings [DE-20].

## STATEMENT OF THE CASE

On December 2, 2004, Claimant protectively filed an application for disability DBI and SSI. She claimed that she became disabled beginning on March 15, 2003 due to a number of impairments including bronchitis, history of colostomy, adjustment disorder and diminished intellectual functioning. (R. 17). Claimant's application was denied initially and upon reconsideration. Claimant then requested a hearing before an Administrative Law Judge ("ALJ"), which took place on July 13, 2007. R. 240-64). After the hearing, on October 11, 2007, the ALJ issued a decision denying plaintiff's claims. The Appeals

Council denied Claimant's request for review on January 8, 2008, rendering the ALJ's decision a "final decision" for purposes of judicial review. See Walls v. Barnhart, 296 F.3d 287, 289 (4th Cir. 2002) (noting that when the Appeals Council denies a request for review, the underlying decision by the ALJ becomes the agency's final decision for purposes of appeal). Claimant timely commenced the instant action pursuant to 42 U.S.C. § 405(g).

## DISCUSSION

### I. The Standard of Review and Social Security Framework

The scope of judicial review of a final decision regarding disability benefits under the Social Security Act, 42 U.S.C. § 405(g), is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. See Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987); see also 42 U.S.C. § 405(g) (2006). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

This Court must not weigh the evidence, as it lacks the authority to substitute its judgment for that of the Commissioner. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Thus, in determining whether substantial evidence supports the Commissioner's decision, the Court's review is limited to whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his or her findings and

rationale in crediting the evidence. See Sterling Smokeless Coal Co. v. Akers, 131 F.3d 438, 439-40 (4th Cir. 1997).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process to be followed in a disability case. See 20 C.F.R. §§ 404.1520 and 416.920. At step one, if the claimant is currently engaged in substantial gainful activity, the claim is denied. If the claimant is not engaged in substantial gainful activity, then at step two, the ALJ determines whether the claimant has a severe impairment or combination of impairments which significantly limit him or her from performing basic work activities. If no severe impairment is found, the claim is denied. If the claimant has a severe impairment, at step three, the ALJ determines whether the claimant's impairment meets or equals the requirements of one of the Listings of Impairments ("Listing"), 20 C.F.R. § 404, Subpart P, App. 1. If the impairment meets or equals a Listing, the person is disabled per se.

If the impairment does not meet or equal a Listing, at step four, the claimant's residual functional capacity (RFC) is assessed to determine if the claimant can perform his or her past work despite the impairment; if so, the claim is denied. However, if the claimant cannot perform his or her past relevant work, at step five, the burden shifts to the Commissioner to show that the claimant, based on his or her age, education, work experience and RFC, can perform other substantial gainful work. The Commissioner often attempts to carry its burden through the testimony of a vocational expert (VE), who testifies as to jobs available in the economy based on the characteristics of the claimant.

In this case, Claimant alleges only one error: that the ALJ's determination that Claimant's mental impairments did not meet the requirements of Listing 12:05B is not

supported by substantial evidence. For the reasons set forth below, the court agrees with Claimant's argument.

## II.     The ALJ's Findings

In his decision, the ALJ proceeded through the five-step sequential evaluation process as set forth in 20 C.F.R. §§ 404.1520 and 416.920, and found that Claimant had not engaged in substantial gainful activity since March 15, 2003, the alleged onset date of her disability. (R. 17). Then, the ALJ proceeded to step two to determine whether Claimant had a "severe" impairment or combination of impairments which significantly limited her from performing basic work activities. See 20 C.F.R. §§ 404.1520(b) and 416.920(b). The ALJ found that Claimant suffered from the severe impairments of bronchitis, history of colostomy, adjustment disorder and diminished intellectual functioning. (R. 17). However, at step three the ALJ determined that Claimant's impairments were not severe enough to meet or medically equal one of the impairments listed in 20 C.F.R. § 404, Subpart P, App. 1. (R. 17). Next, at step four the ALJ determined Claimant's RFC by considering all of her symptoms as well as the objective medical evidence. (R. 18-21). At step five, the ALJ determined that Claimant could not return to her past relevant work. (R. 21). Nonetheless, the ALJ concluded that although Claimant's exertional limitations did not allow her to perform a full range of medium work, there were a significant number of jobs in the national economy that she could perform. (R. 22). Examples of such jobs included employment as a grocery stacker, DOT # 381.687-022, cleaner of lab equipment, DOT # 381.687-022, and laundry laborer, DOT # 361.687-018. (R. 22). As a result, the ALJ found that Claimant was not under a

4

"disability," as defined in the Social Security Act, from March 15, 2003, the alleged onset date, through the date of his decision. (Id.).

## III. The Administrative Hearing

### A. Claimant's Testimony

Claimant testified at her administrative hearing. (R. 244-59). Claimant lives with her husband and adult daughter. (R. 244). She was 52 years old on the date of the hearing. (R. 244). Claimant completed the 10th grade in school and did not get her GED because she failed the exam. (R. 244-45). She was in special education classes while in school, but had a recorded IQ of 89 in high school. (R. 245). She has difficulty reading and can not read a newspaper. (R. 246).

Claimant is not currently working and has not worked since the alleged onset date of her disability in March 2003. (R. 246). The last job that Claimant had was in as sock manufacturing factory, in which she put socks on a machine. (R. 246-47). She had that job for three years. (R. 247). Before that, she worked as a spinner at a Yarn company. (R. 247).

In 2000 or 2001, Plaintiff got sick, she was unable to work due to bleeding from her rectum. (R. 248). She was admitted to the hospital and had a colostomy. (R. 248). Currently, she sees her treating physician about once every three months. (R. 248). Claimant takes medication for depression and anxiety, such as Advair, Zoloft, and Lorazapam. (R. 249). The medications do not cause side effects that would affect her ability to work. (R. 249). However, she is not often able to take her mediation because she is unable to pay for them. (R. 259). Her biggest medical problem that keeps her from working is a side-effect from the colostomy, which makes it very difficult for her to control

5

her bowls. (R. 249). Claimant went back to work after her colostomy. (R. 249). She is not seeing a doctor for issues related to her colostomy because there is nothing that a doctor can do. (R. 250).

Claimant also suffers from depression and anxiety attacks. (R. 252). On bad days, she does not feel like getting out of bed. (R. 252). In addition, she has bronchitis, which makes it difficult for her to breathe. (R. 253). She also suffers from glaucoma and back pain. (R. 254). Claimant takes Ibuprofen and Goody's Powder to help with the pain and tries to exercise. (R. 255-56). Claimant does not experience pain from sitting in a chair or lifting objects. (R. 256).

Around the house, Claimant is able to clean and get groceries. (R. 256-57). Claimant does not participate in many activities outside of the home, but does go to church every other week. (R. 257).

B. Vocational Expert's (VE) Testimony

Kimberly Engler testified as a VE at the administrative hearing. (R. 259). The VE was present throughout the hearing and listened to the testimony of Claimant. (R.260). The VE assessed Claimant's past work as medium or light unskilled work. (R.260). The ALJ posed the following hypothetical:

> [A]ssume a hypothetical individual with the same age, education and work background as that of the claimant. And I want you to further assume this hypothetical individual is limited to the performance of medium work as that term is defined in the regulations. This individual would be limited to forms of simple routine repetitive . . . nonproduction . . . work. Can you suggest any jobs that hypothetical individual could perform?

(R. 260). The VE answered in the affirmative. Id. According to the VE, such an individual could hold employment as a grocery stacker, cleaner of laboratory equipment, or laundry

6

laborer. Id. All of the above mentioned jobs existed in significant numbers in both the state and national economies. Id.

The ALJ then asked the VE whether a hypothetical individual could engage in full time employment if, in addition to the limitations described above, she also had to go to the restroom every 15 minutes. (R. 261). The VE testified that a hypothetical person with those limitations could not engage in full-time employment. Id.

## IV. Documentary Evidence of Psychological Evaluations

Claimant has taken a number of IQ tests over the years. She apparently took four during her school years. The first IQ test was given in July 1966, when she was eleven years old, and she scored a 62. (R. 82). It seems that the next month, August 1966, Claimant took another IQ test, on which she scored a 72. (R. 82) On two other occasions during her elementary school years, she took IQ tests, and scored an 89 on both of them. (R. 82). In addition, Claimant's school records show that she was in special education classes in eighth and ninth grades. (R. 82-84).

In addition, Claimant took an IQ test as part of a consultative psychological evaluation performed by W. Jim Miller, Ph.D. at the request of the North Carolina Disability Determination Services. (R. 139-42). He recorded Claimant's verbal IQ as 61, her performance IQ as 58, and her full scale IQ as 56. He diagnosed Claimant with "mild mental retardation," which he believed to be "in the accurate range and a lifelong range." (R. 142). He also noted that although he was not asked to test her academically, he believed she was illiterate. (R. 142).

## IV. Claimant's Argument

Claimant contends that the ALJ erred by failing to find that her impairments meet or medically equal the requirements of one of the Listing of Impairments. Specifically, Claimant argues that her impairments meet or medically equal the Listing for mental retardation, 20 C.F.R. § Part 404, Subpart P, Appendix 1, 12.05B. (See Plaintiff's Brief at 4-11). For the following reasons, this court concludes that substantial evidence does not support the ALJ's findings, and that remand is appropriate.

In order to determine whether someone suffers from mental retardation, in accordance with Listing 12.05, a two step process is required. Norris v. Astrue, No. 7:07-cv-184-FL, 2008 WL 4911794, at *2 (E.D.N.C. 2008). First, an ALJ must determine if a claimant has "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. § 404, Subpart P., App. 1, 12.05. If a claimant satisfies that first step, then an ALJ must determine if the claimant satisfies the requirements in A, B, C, or D. Id.

> A. Mental incapacity evidenced by dependence on others for personal needs (e.g., toileting, eating, dressing, or bathing) and an inability to follow directions, such that the use of standardized measures of functioning is precluded; or
>
> B. A valid verbal, performance, or full scale IQ of 59 or less; or
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; or
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>     1. Marked restriction of activities of daily living; or
>     2. Marked difficulties in maintaining social functioning; or

8

>3. Marked difficulties in maintaining concentration, persistence or pace; or
>4. Repeated episodes of decompensation, each of extended duration.

Claimant argues that she satisfies the B criteria, because the most recent IQ test that she took established that she had a performance and full scale IQ of less than 59.

This first step, or the "diagnostic" element of the analysis, is not satisfied by a low IQ alone. Norris, 2008 WL 4911794, at *3. The "diagnostic description requires findings on both intelligence and adaptive functioning." Id. In this case, the ALJ did not expressly go through this two step analysis. However, it is clear that he considered some of the elements associated with the first "diagnostic" element of the inquiry. The ALJ stated that Claimant had no restrictions in activities of daily living, mild difficulties in social functioning, moderate difficulties with regard to concentration, persistence and pace, and no episodes of decompensation. The ALJ noted that claimant was "able to work for many years despite her diminished intellectual functioning" and that "[w]hile in school, she was able to achieve an IQ score of 89." (R. 18).

These statements by the ALJ seem to suggest that he considered some evidence relevant to a finding that Claimant did not have subaverage general intellectual functioning, deficits in adaptive functioning and an onset date prior to age twenty-two, which is required in the first step of the analysis. 20 C.F.R. § 404, Subpart P., App. 1, 12.05. However, this evidence is subsumed into an analysis of whether Claimant satisfied one of the four requirements in the second step of the analysis. The ALJ's analysis starts with the second step of the analysis, as he considered at the outset whether Claimant met Listing 12.05B, 12.05C or 12.05D. There is no need to consider whether a claimant satisfies the requirements in A-D of 12.05, if the ALJ first finds that a claimant failed to satisfy the first

9

step of the inquiry. Because the ALJ does not specifically mention the first "diagnostic" step of the mental retardation analysis, and because the ALJ moved directly into a discussion of the second step of the inquiry, it is unclear whether the ALJ actually engaged in the first step of the analysis. See Hansen v. Astrue, No. 4:07-CV-24-WW, at 7 (E.D.N.C. Nov. 2, 2007) (noting that the ALJ did not specifically address the first step in the process of assessing mental retardation under Rule 12.05, and remanding for further proceedings).

The ALJ considered the criteria established in 12.05B and concluded that they were not met "because the claimant does not have a valid verbal, performance, or full scale IQ of 59 or less." However, Dr. Miller evaluated Claimant in 2005 and concluded that she had a valid verbal IQ of 61, a valid performance IQ of 58 and a valid full scale IQ of 56. (R. 141). Moreover, in another section of his decision, the ALJ described Dr. Miller's evaluation and the scores of Claimant's IQ test. (R. 20).

The government argues that Claimant's ongoing problem with depression could "have operated to artificially reduce the IQ score" provided by Dr. Miller. See Mem. In Supp. of Commissioner's motion, at 9. However, both the ALJ, in a separate part of his decision, and Dr. Miller, noted that Claimant's depression was mild. (R. 21, 142). Moreover, the ALJ, himself, did not provide any explanation or rationale for his statement that Claimant does not have a valid IQ score of 59 or less. If, for some reason, the ALJ concluded that Dr. Miller's IQ evaluation was invalid, then he needed to explain his reasoning for so concluding. See, e.g. Soc. Sec. Reg. 96-2p (noting that when the decision or determination by an ALJ is unfavorable, "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical

10

opinion, supported by substantial evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight"). Here, the ALJ did not provide any reason for discrediting the IQ test that Dr. Miller administered to Claimant. Accordingly, the matter should be remanded so that the ALJ can perform the required analysis pursuant to Listing 12.05.

## CONCLUSION

The undersigned **RECOMMENDS** that the plaintiff's motion for judgment on the pleadings be **GRANTED**, the defendant's motion for judgment on the pleadings be **DENIED**, and the case be remanded for a rehearing consistent with this Memorandum and Recommendation. The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have ten (10) days after receiving it to file written objections. Failure to file timely written objections bars or may bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Report and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

This 8th day of April, 2009.

DAVID W. DANIEL
United States Magistrate Judge

11